ALEXANDER H. HOLWAY *vs.* CHARLES E. FULLER.

Suffolk.   Nov. 22, 1878. — Jan. 11, 1879.   COLT & MORTON, JJ., absent.

In an action on an agreement of indemnity, it appeared that the plaintiff had been applied to by A. to negotiate a loan on a certificate of stock as collateral security; that he then applied to the defendant, who said he suspected that the certificate was not genuine, agreed to lend the money if it was genuine, requested the plaintiff to bring A. to the defendant's office, and made arrangements to have A. arrested there in case the certificate was not genuine. The defendant also requested the plaintiff, if A. would not come to the office, to draw his draft on the defendant for the amount of the loan, less the commission, payable to the order of A., and give the same to A. for the certificate, agreeing to hold the plaintiff harmless; and intending to have A. arrested, if the certificate should not be genuine. A. refused to go to the defendant's office, and the plaintiff gave A. his draft and received the certificate, which proved to be forged; and the plaintiff was obliged to pay the draft. *Held,* that if the plaintiff acted in good faith, he could maintain the action.

CONTRACT against the defendant, as surviving partner of the firm of C. E. Fuller and Company, on an agreement of indemnity. Writ dated February 17, 1877. At the trial in the Superior Court, before *Rockwell*, J., the plaintiff put in evidence tending to prove the following facts:

In February 1875, Marion E. Warren applied to the plaintiff to procure for her a loan of $2,000 on sixty shares of stock of the Michigan Central Railroad Company as collateral security. Warren did not show the plaintiff any certificate of stock or refer to any specific shares of stock by number of certificate or otherwise. The plaintiff, who was then a real estate and mortgage broker in Boston, and occasionally negotiated loans on personal security, applied for the loan to C. E. Fuller and Company, bankers and brokers in Boston, who told him that they would consider the application and make inquiries as to the value of the stock, and requested him to call again for an answer. On or about February 17, 1875, the plaintiff again called on C. E. Fuller and Company, and the defendant, Fuller, then informed him that, from inquiries which he had made with reference to the stock since the plaintiff had applied to him, he suspected that Warren proposed to give as collateral security a certificate purporting to be for sixty shares of the stock, but which in reality had originally represented one share, and had been raised and

altered to represent sixty shares. The plaintiff expressed his surprise at this information, and said to the defendant that, if that were so, he should have nothing more to do with the matter. The plaintiff in fact had applied for the loan in good faith, and had had no reason theretofore to suppose that anything but a genuine certificate would be offered by Warren, and had had no complicity or connection with Warren or others in stock-raising or altering, and had had no knowledge or suspicion of the same on the part of Warren or others. The defendant then told the plaintiff that C. E. Fuller and Company were willing to make the loan asked for on a genuine certificate, and requested the plaintiff to go to Warren's residence and ask her to come with him to the office of C. E. Fuller and Company and personally receive the money on the certificate, and the defendant procured the attendance of two detectives at his banking office, and all arrangements between the plaintiff and the defendant were made in their presence. It was arranged that they were to await the return of the plaintiff and Warren with the certificate.

The defendant, suspecting that Warren would not come to the office, suggested to the plaintiff that, if she refused to come, he should draw his draft on C. E. Fuller and Company for the amount of the loan less his commission for effecting the same, payable to the order of Warren, and give the same to her for the certificate which she might offer, and bring the certificate immediately to C. E. Fuller and Company. The plaintiff hesitated, and requested time to consult counsel; but the defendant and the other member of the firm of C. E. Fuller and Company urged him, and said that they would hold him harmless against all damage and liability that might accrue from his making and delivering his draft to Warren, and thereupon the plaintiff consented. The defendant then gave the plaintiff a printed draft on C. E. Fuller and Company, with blank spaces left for the amount, and the names of drawer and payee, affixing a two-cent revenue stamp to the same, and cancelling this with C. E. Fuller and Company's office stamp before delivering it to the plaintiff, and gave him also a note for $2,000, filled out to the order of C. E. Fuller and Company, leaving a blank for Warren's signature. C. E. Fuller and Company retained from their bank deposit, as it was then about the close of banking hours, $2,000, to be paid to Warren if

she came to get the money personally, or to meet the draft in case the plaintiff should bring from Warren a genuine certificate. It was the intention of C. E. Fuller and Company, and this they communicated to the plaintiff, in case Warren should give a raised certificate, to take measures for her immediate arrest. The value of sixty shares of the stock was then upwards of four thousand dollars.

The plaintiff proceeded to Warren's residence, and met her, after waiting till about four o'clock in the afternoon. Warren refused to go to Fuller's office, and, after some discussion between her and the plaintiff as to the amount of commissions, the plaintiff finally filled out the draft on C. E. Fuller and Company, payable to her order, for $1,964.17, and gave her the same. Warren at the same time signed the note, and a blank power of attorney, authorizing the transfer on the back of a certificate purporting to be for sixty shares of stock of the Michigan Central Railroad Company, in presence of a witness, and delivered the note and certificate to the plaintiff in exchange for the draft. The plaintiff, without examining the certificate, returned immediately to the office of C. E. Fuller and Company, arriving there a little after five P. M., but found that the members of that firm had left for the day, and had left the charge of the matter to W. C. Ellis, their clerk. At the request of Ellis, and in accordance with instructions, which he said had been given him by C. E. Fuller and Company, the plaintiff accompanied him to the office of certain detectives, for the purpose, in the first place, of submitting the certificate to them, in order to ascertain if it were really raised, in which event Ellis said his instructions from C. E. Fuller and Company were to proceed at once to arrest Warren. The detectives refused to act in the matter, and, it then being about seven o'clock in the evening, the plaintiff was obliged to go home. Ellis thereupon asked him for the certificate, in order to take it that evening to one of the firm of C. E. Fuller and Company. The plaintiff said that that was all he had to show for the draft which he had given Warren, and asked for a receipt, whereupon Ellis gave him a memorandum as follows: " Boston, February 17, 1875. Received of A. H. Holway certificate purporting to be 60 shs. Mich. Central R. R. Co., No. 27,866, in name of M. E. Warren, holding A. H. Holway harmless for

$1,964.17, drawn this day. C. E. Fuller & Co., W. C. Ellis." The plaintiff then gave Ellis the certificate, which he the same evening delivered to one of the firm of C. E. Fuller and Company, by or for whom it has since been and now is held. The difference between the amount of the draft and $2,000 was to include a small brokerage for C. E. Fuller and Company, and the plaintiff's commission, which was to be paid by C. E. Fuller and Company in case the certificate should prove genuine, and it never was paid the plaintiff.

The next morning the plaintiff, at the request of C. E. Fuller and Company, accompanied the defendant and the other member of that firm and Ellis to the office of one Boynton, then chief of the detective force of the Commonwealth. There, the certificate being in the hands of a detective officer present, the defendant, in the presence of all the parties named, asked him to give the certificate back to him, and snatched at it, and, on the officer's refusing, insisted on having it, saying that he had given his receipt for it, and threatening legal proceedings against the officer if he did not return it. The officer thereupon handed it to Boynton, who gave the defendant a receipt for it, and Boynton at a subsequent date redelivered it to C. E. Fuller and Company. The same morning, the plaintiff and defendant discussed the transactions of the previous evening between the plaintiff and Ellis, and neither then nor in subsequent conversations had by the plaintiff with the defendant on the matter did the defendant dispute the authority of Ellis to give the receipt. The same morning the plaintiff delivered the note to C. E. Fuller and Company. In the course of the morning, a warrant for the arrest of Warren having been procured, several officers proceeded with one of the firm of C. E. Fuller and Company and the plaintiff to Warren's residence, arriving there about eleven A. M., but it was found that she had just left the house; and she was not arrested.

The plaintiff testified that, after the defendant had told him of his suspicions as to the certificate Warren would offer, he acted entirely at the request and in accordance with the directions of the defendant; that he then suspected himself that the certificate would be a raised one, but that before and at the time of the delivery of the certificate to Ellis, he had no actual knowledge that it was raised, nor has he had since; and further stated that, on

the advice of his counsel in the suit brought against him on the draft, he had made an affidavit of defence on knowledge, information and belief, dated May 13, 1876, wherein he swore that the certificate obtained by him from Warren was forged and raised from a certificate representing one to represent sixty shares, and that at the time of making the affidavit, and since, he has believed it to have been so raised.

Subsequently Warren indorsed the draft for its face value to S. Jones and Company, bankers at St. John, N. B., who forwarded it in due course to a bank in Boston for collection from C. E. Fuller and Company, but on presentment to them they refused to pay it, and it was returned to S. Jones and Company protested. By writ dated February 18, 1876, S. Jones and Company sued the present plaintiff, declaring on the draft, in which suit the present plaintiff appeared by counsel and filed an answer. On November 21, 1876, and before trial, the present plaintiff notified the defendant and C. E. Fuller and Company of the pendency of the suit against him, and requested them to come in and defend the same, which they refused to do. On December 1, 1876, S. Jones and Company obtained a verdict against the present plaintiff for $2,180.20, being the amount of the draft and interest, and on December 28, 1876, judgment was entered, and thereupon execution issued against him in favor of S. Jones and Company on this judgment for $2,190.03 damages, and $31.25 costs of suit. The present plaintiff thereupon gave his promissory note, payable to the order of S. Jones and Company on demand, for the amount of the execution, which was returned by S. Jones and Company satisfied and discharged, and also, after commencing the present action, assigned the same and his claim against the defendant for indemnity to said S. Jones and Company as collateral security for the note. S. Jones and Company still hold the note, which has not been paid. The record in the suit of S. Jones and Company against Holway was put in evidence. The defendant in the present case objected to the admission of the record in the suit of Jones *v.* Holway, the notice of the pendency of the action and the proceedings, judgment and execution founded thereon, as in any manner relating to or binding upon the defendant in the present suit; and the judge sustained the objection.

On the foregoing facts and evidence, the judge ruled that the plaintiff could not enforce the contract of indemnity, and that there was no evidence on which in any form the plaintiff could recover; and directed a verdict for the defendant. The plaintiff alleged exceptions.

*C. H. Hill & W. S. Macfarlane*, for the plaintiff, cited *Battersey's case*, Winch, 48; *S. C. nom. Fletcher* v. *Harcot*, Hutton, 55; *Merryweather* v. *Nixan*, 8 T. R. 186; *Humphrys* v. *Pratt*, 2 Dow & Cl. 288; *Adamson* v. *Jarvis*, 4 Bing. 66; *Betts* v. *Gibbins*, 2 A. & E. 57; *Dugdale* v. *Lovering*, L. R. 10 C. P. 196; *Jacobs* v. *Pollard*, 10 Cush. 287; *Babcock* v. *Terry*, 97 Mass. 482; *Greene* v. *Goddard*, 9 Met. 212; *Aldrich* v. *Ames*, 9 Gray, 76; *Washburn* v. *Pond*, 2 Allen, 474; *Day* v. *Stickney*, 14 Allen, 255.

*A. V. Lynde & W. P. Harding*, for the defendant, cited Met. Con. 216–219; *Shackell* v. *Rosier*, 2 Bing. N. C. 634, and cases cited; *Welch* v. *Matthews*, 98 Mass. 131; *Wheeler* v. *Russell*, 17 Mass. 259; *Libby* v. *Downey*, 5 Allen, 299; *Miller* v. *Post*, 1 Allen, 434; *Nourse* v. *Pope*, 13 Allen, 87; *Fuller* v. *Dame*, 18 Pick. 472; *Gibbs* v. *Smith*, 115 Mass. 592; *Farnsworth* v. *Hemmer*, 1 Allen, 494; *Rice* v. *Wood*, 113 Mass. 133; *Sewall* v. *Sparrow*, 16 Mass. 24; *Butts* v. *Dean*, 2 Met. 76; *Curtis* v. *Hubbard*, 9 Met. 322; *Morton* v. *Austin*, 12 Cush. 389.

AMES, J. Upon the facts stated in this bill of exceptions, it appears to us that the plaintiff had a case upon which he was entitled to go to the jury. The bill of exceptions imports that he presented the fraudulent certificate as security for a loan to his client Warren, in the regular course of his business as a broker, and that in so doing he acted in entire good faith and with no knowledge or suspicion that the certificate had been fraudulently altered. If so, we see no illegality or unfairness, either in his refusal to go on with the matter of procuring the loan, or in his consenting, after being informed of the true character of the certificate, to join in the detection of the offender, and in the attempt to bring her to justice. Certainly his duty to his client did not require him to connive at such a fraud, or to aid in its concealment or impunity.

As the plaintiff presents his case, all that afterwards passed between him and his client Warren was in pursuance of an arrangement suggested and urged by the defendant, in accordance

with the defendant's instructions, and upon the defendant's express promise to hold the plaintiff harmless against all damage and liability that might accrue from his making and delivering his draft to Warren. The plaintiff's claim is, that, not having succeeded in prevailing upon Warren to go to the defendant's office, where it was arranged that she should be arrested, he, in pursuance of the arrangement with the defendant, took Warren's note for the amount of the proposed loan, and the certificate of the sixty shares, and gave her a draft on the defendant for the same amount, less the brokerage, the design being that Warren, on presenting the draft, should be at once arrested. Instead, however, of presenting the draft in person, Warren transferred it to another party, by whom it was forwarded in due course to a bank in Boston for collection. On its presentation to the defendant for payment, it was dishonored and protested. The holder thereupon, having given due notice to the plaintiff, brought a suit against him, and he, as he contends, has been compelled to pay the entire amount, with interest and costs.

In considering the effect of the plaintiff's exceptions in the present position of the case, it must be assumed that he is able to prove the case which he stated, and which he offered to prove. In ruling that there was no evidence on which he could recover, and directing a verdict against him, the court must be understood as taking the ground that, on the assumption that his story is true throughout, he, as matter of law, is not entitled to recover.

It appears to us, however, to be entirely a question as to his good faith, and as such is a question peculiarly within the province of the jury. If there was such a contract of indemnity by the defendant, if the draft was given to Warren in the manner and under the circumstances alleged by the plaintiff, if there was no collusion between him and the party holding the draft, and if he gave his note for the amount of the judgment in good faith and in consideration of the release of the judgment and satisfaction of the execution, it is difficult to see why he is not entitled to prevail in this suit. *Day* v. *Stickney*, 14 Allen, 255. *Washburn* v. *Pond*, 2 Allen, 474. But this is wholly a question of fact, and not of law. It should have been passed upon by the jury, under proper instructions, and not by the court.

*Exceptions sustained.*